Newport Township School District, Appellant, *v.*
State Tax Equalization Board.

Argued January 10, 1951. Before DREW, C. J., STERN, STEARNE, JONES, BELL and LADNER, JJ.

*R. Lawrence Coughlin,* Special Counsel, with him *Paul R. Selecky,* Solicitor for Newport Township School District, and *Coughlin & Hughes,* for appellant.

*George W. Keitel,* Deputy Attorney General, with him *H. Albert Lehrman,* Deputy Attorney General and *Charles J. Margiotti,* Attorney General, for appellee.

OPINION BY MR. JUSTICE LADNER, March 22, 1951:

This is an appeal in the nature of a certiorari taken by the School District of the Township of Newport from an order of the State Tax Equalization Board of the Commonwealth of Pennsylvania. The Deputy Attorney General moves to quash for the reason that, even treating the appeal strictly as a certiorari, we are without power to entertain this writ.

Before pursuing this inquiry it is necessary to determine the nature and character of the State Tax Equalization Board, its purposes and function. This Board was created by the legislature in 1947 (Act of June 27, P. L. 1046, 72 P.S. 4656.1) as an "independent administrative board," for the purpose of (see title of Act) "providing for equalization of assessed valuations of real property throughout the Commonwealth for use in determining the amount and allocation of the Commonwealth subsidies to school districts."

The situation which gave rise to the Act was the lack of uniformity of the taxing districts of the State in establishing the "assessed" value of real property. The Act of May 22, 1933, P. L. 853, as amended, 72 P.S. 5020-402, directs real property to be assessed at its *actual* value, but in practice there is a wide variation between taxing districts in the percentage of actual value that is taken as the assessed value. That is to say, some taxing districts make the assessed value as low as 20% of the actual value whereas others make the assessed value a full 100% of the actual value. As assessed value of real property of a school district was one of the basic factors in the formula by which the school subsidy is distributed, it followed that this lack of uniformity became, in turn, reflected in a corresponding inequality of distribution of the State school subsidies appropriated to complement funds raised by the local school districts. Thus a school district whose taxes were imposed upon property assessed at a *full 100% of its actual value received a much smaller subsidy proportionately than the school district in which the taxable real property was assessed at only 20% of its actual value. It was to remedy this unfair result that the legislature created the State Tax Equalization Board which has the duty under section 7, to determine the "market value" of taxable

real property in each school district and to certify to the Superintendent of Public Instruction a list showing both the market value of the taxable real property and the assessed value for county tax purposes. The Act expressly provides (sec. 17) it is not to be construed as changing or affecting the validity of the assessed value. The only purpose of the act is to enable the state school subsidy to' be divided fairly by substituting the market value found by the Board for the local assessed value in the formula by which the subsidy is allocated.

The only right which this Act gives to any school district is that given by section 13, 72 P.S. 4656.13, which reads, "Any school district aggrieved by any finding or conclusion of the board affecting the amount of any Commonwealth subsidy payable to it, may, in writing, state its objections thereto, and shall thereupon be granted a hearing by the board at which the district shall have the right to submit evidence for the purpose of showing that the findings of the board are incorrect, and to present arguments to substantiate its contentions. After carefully considering all evidence submitted and the arguments of the district, the board shall make such modifications and adjustments of its findings and computations as to it shall appear proper or it may dismiss the objections. In either event the decision of the. board shall be final. The valuations so adjusted shall form the basis upon which valuations for the purpose of determining the amounts of Commonwealth subsidies shall be determined as hereinafter provided."

It will be observed the right conferred by this section is exceedingly limited and the school district may by argument or evidence endeavor to persuade the Board to modify or adjust its findings. The Board may make such modifications or dismiss the objections.

Its findings are within its discretion, its decision is expressly made final, and no right of appeal therefrom is given to any court.

In the case before us the Newport School District did file objections, was granted hearings and the Board refused to change its findings. Complaint is now made of the way that the hearings were conducted, particularly that the Board (1) refused to make available the basis of its findings, (2) refused to issue subpoenas at the request of the School District, (3) refused to have certain of its experts appear and be examined. In addition, it is complained that the Board failed to observe the proper standards in determining the "market value" and erred in dismissing the objections.

The Commonwealth contends that the Board functions not as a judicial body but as a legislative or administrative body designated by the legislature to supply one fact of a legislative formula by which school subsidies are allocated. With this we must agree. The appropriation and distribution of the school subsidy is a peculiar prerogative of the legislature for no other branch of the State Government has power to appropriate funds. Though the legislature ordinarily ascertains it facts through its legislative committees or commissions, there is no reason why it cannot do so by a particular board as here set up. It could have provided for a review of that board's findings by a judicial tribunal but it is not required to do so. No property right is involved, and we must respect the legislative prerogative to control the State's finances, a prerogative that is subject only to constitutional limitations: *Com. ex rel. Schnader v. Liveright et al.,* 308 Pa. 35, 67, 161 A. 697 (1932).

Having determined the nature, character and functions of the Equalization Board, we come to the nar-

row question whether we have power to entertain by certiorari the School District's complaints of the board's conduct or findings in face of the legislative mandate that its decisions shall be final.

In support of the motion to quash, the learned Deputy Attorney General argues that Article V, section 3, of the present Constitution fixes our appellate jurisdiction in the following language, that [this Court] "shall have appellate jurisdiction by appeal, certiorari or writ of error in all cases, as it now or may hereafter be provided by law." No statute since 1874 has enlarged our certiorari powers so far as *administrative* or nonjudicial tribunals are concerned and therefore we are necessarily referred to our common law certiorari power or such as may exist by earlier statutes. With this statement of the controlling question we agree.

What then are our powers of certiorari either by virtue of statute or common law? We entertain no doubt of our plenary power to review and supervise proceedings of inferior courts or judicial officers or judicial tribunals of this Commonwealth by the common law writ of certiorari. In *Rimer's Contested Election*, 316 Pa. 342, 345-6, 175 A. 544 (1934), it was said, "The Act of May 22, 1722, P. L. 131, not only expressly granted to the justices of the Supreme Court the right to issue writs of certiorari and other process, but also authorized them 'to exercise the jurisdictions and powers granted by the act as fully and amply, to all intents and purposes whatsoever, as the Justices of the Court of King's Bench, Common Pleas and Exchequer, at Westminster, or any of them may or can do.' Subsequent enactments do not derogate from these powers but rather confirm and enlarge them. The Act of 1836, P. L. 784, gave to the court the right, 'generally, to minister justice to all persons, in all mat-

ters whatsoever, as fully and amply, to all intents and purposes, as the said court has heretofore had power to do, under the Constitution and laws of this Commonwealth.' Indeed, we have held that 'the legislature lacks power to deny this court the right of issuing common law certioraris to test the jurisdiction of subordinate tribunals,' although, in legislating as to methods of review, it may affect the exercise of that prerogative: . . ." However, what was there said and in similar cases cited by the learned counsel for the School District was said with respect to our supervision over judicial or quasi-judicial tribunals. Whether we have the power to review directly by certiorari, the findings or actions of a non-judicial administrative board in the absence of any such authorization by the legislature is an entirely different question. In *Short's Estate,* 315 Pa. 561, 173 A. 319 (1934), we decided we had no such right. This is in accord with the general rule as pointed out in the learned Deputy Attorney General's brief; see 40 Am. State Reports 36, where it is said, ". . . the authorities agree that *certiorari* does not lie to review or annul any judgment or proceeding which is not judicial in its nature, but with respect to various proceedings there is room for great difference of opinion as to whether they are judicial or not. If they are either legislative or executive, they are beyond the reach of this writ." And see *Standard Oil Co. of Calif. v. State Board of Equalization,* 59 P. 2d 119 (1936).

Learned counsel for the School District cites in support of his position: *Rimer's Contested Election* (supra) ; *Kaufman Construction Co. v. Holcomb,* 357 Pa. 514, 55 A. 2d 534 (1947) ; *Hotel Casey Co. v. Ross,* 343 Pa. 573, 23 A. 2d 737 (1942) ; *Carroll's Appeal,* 336 Pa. 257, 259, 9 A. 2d 407 (1939) ; *State Board of Undertakers v. Frankenfield,* 329 Pa. 440, 198 A. 302 (1938) ;

*Grime v. Dept. of Public Instruction et al.,* 324 Pa. 371, 188 A. 337 (1936) ; *White Township School Directors' Appeal,* 300 Pa. 422, 150 A. 744 (1930). In all of those cases the appeal in the nature of a certiorari was from a court of inferior jurisdiction and not directly from any administrative board as here.

Counsel for the School District further argues our writ of certiorari lies to the Board pursuant to the "King's Bench Power" under the Act of May 22, 1722, 1 Sm. L. 131, 140, 17 P. S. 41 note. There was cited to us in support of that assertion the report of the Pennsylvania Bar Association's Administrative Law Committee, notably that portion prepared by F. Eugene Reader, Esq., as published in the Pennsylvania Bar Quarterly, Vol. X, for June, 1939, p. 303, in which "Methods of Judicial Review where no Direct Appeals are Provided," are ably and comprehensively discussed. There, at p. 317, it is stated "The writ of *certiorari* was a common law writ which was issued out of the Court of King's Bench to examine and review the proceedings of all inferior tribunals. It was held at an early time that the writ was available against bodies other than courts and would issue to boards or commissions created by statute, such as the Commissioners of Sewers, in order to keep them within their proper jurisdiction" citing *Rex v. Inhabitants of Glamorganshire,* 1 Ld. Raym. 580, 91 Eng. Rep. 1287 (1700). An examination of that case shows that there "justices of peace" were authorized by act of parliament to levy money for repairing a bridge and the extent of their jurisdiction or authority to repair the wears as well as the bridge was inquired into by certiorari issuing out of the Court of King's Bench. But these justices were exercising judicial functions, and besides Justices of Peace were always subject to supervision and review by certiorari at common law as well as in this State: *Burginhofen*

*v. Martin,* 3 Yeates 478 (1803) ; *Bauer v. Angeny,* 100 Pa. 429 (1882). It will be observed also that this old English case is in keeping with the rule that at common law the writ was available to review the proceedings of inferior judicial tribunals, judicial officers or bodies exercising judicial acts. It is no clear authority however for the proposition that common law certiorari lay against a distinctly non-judicial, legislative or executive committee, commission or board: cf. 40 American State Rep. 38.

In *Drainage Commissioners v. Giffin,* 134 Ill. 330, 25 N. E. 995, 996 (1890), the Supreme Court of Illinois pointed out that in England the writ of certiorari was not a writ of right but issued only upon application to the court on proper cause shown and was awarded to inferior tribunals and jurisdictions where it appeared they had exceeded the limits of their jurisdiction or where they proceeded illegally. The purpose of the writ was to bring the entire record of the inferior tribunal before the superior court to determine whether the former had jurisdiction or had exceeded its jurisdiction or had failed to proceed according to the essential requirements of the law. This was determined solely by inspection of the record, no inquiry as to any matter not appearing in the record being permissible. It was then stated to be the general rule that the writ lies only to inferior tribunals and officers exercising judicial functions and the act to be reviewed must be judicial in its nature, not ministerial or legislative. Though the tribunal need not be technically judicial or constitute a court of justice in the ordinary sense, if they are invested by the legislature with the power to decide on property rights of others they are acting judicially in making their decision whatever may be their public character.

The motion to quash is sustained.