Schiller-Pfeiffer, Inc. *v.* The Upper Southampton Township Board of Adjustment.

Argued February 9, 1971, before President Judge BOWMAN and Judges CRUMLISH, JR., KRAMER, WILKINSON, JR., MANDERINO, MENCER, and ROGERS.

*Reuben E. Cohen,* with him *Harold Greenberg* and *Cohen, Shapiro, Berger, Polisher & Cohen,* and *Pearce H. E. Aul,* for appellant.

*William J. F. Bell,* for appellee.

OPINION BY JUDGE ROGERS, April 14, 1971:

At issue is the validity of an amendment to a zoning ordinance limiting any increase in the size of a building housing a nonconforming use to fifty percent of the size of the building at the time the original ordinance became effective.

The Zoning Hearing Board of Upper Southampton Township denied the application of appellant Schiller-Pfeiffer, Inc. to enlarge by 8,100 square feet the building housing its nonconforming manufacturing, assembly and machine shop operation on the ground that the proposed expansion would violate the above limitation. The Court of Common Pleas of Bucks County affirmed.

From a time prior to the enactment of the original Zoning Ordinance of Upper Southampton Township in 1954, Schiller-Pfeiffer has operated a machine shop and plant for the manufacture and assembly of garden tools on a tract of almost six acres of land. To a depth of 450 feet from the public road on which it fronts, the tract is in a C-2 Commercial zoning district; the balance of the tract is in an R-3 Residential zoning district. Part of the building is located in each district and the use is nonconforming in each district. In 1954, when the township's zoning ordinance was enacted, Schiller-Pfeiffer's one-story building occupied 36,520 square feet. Prior to October 6, 1962, the date

of the amendment being attacked, a prior amendment had permitted enlargement of a building housing a nonconforming use to an extent limited only by setback requirements and a requirement that the area of a lot occupied by buildings could not exceed thirty percent of total lot area in a C-2 Commercial District and twenty-five percent in an R-3 Residential District. Pursuant to the first amendment, Schiller-Pfeiffer properly added 14,310 square feet to its building, making the present area of the building 50,830 square feet. On October 6, 1962, Section 1203-2 of the zoning ordinance relating to expansion of nonconforming uses was amended to read as follows: "A nonconforming use may be extended throughout the building or structure, or lot in or on which located, and the building in which it is located may be increased in size provided, however, that any such increase in size of the building or of the use will not increase the lot area covered beyond 50 percent of the area covered by the use at the time of the effective date of the original Zoning Ordinance of Upper Southampton Township, Ordinance No. 14, and further provided that any such extension will conform to the height, side, front and rear yard requirements of the Zone in which located."

Schiller-Pfeiffer was therefore permitted to expand its building, which covered 36,520 square feet at the effective date of the original zoning ordinance, by fifty percent, or an additional 18,260 square feet, making the permitted area 54,780 square feet. The present area being 50,830 square feet, Schiller-Pfeiffer is permitted to expand its building an additional 3,950 square feet but not the 8,100 square feet desired. The present building covers slightly in excess of twenty percent of the entire lot area. Appellee in an Agreed Statement of Facts admitted that the proposed addition is required by natural expansion in appellant's business which has increased 118 percent since 1962 and admit-

ted that the present production line has become too short for efficient production and cannot be lengthened within the present building unless additional space is provided elsewhere for storage. The Zoning Hearing Board found that the proposed addition would be detrimental to health, safety, morals and the general welfare.

Appellant concedes that a township can impose reasonable restrictions on the expansion of nonconforming uses, but contends that "not only is appellant entitled, as of right, to natural expansion of its nonconforming use, but additional construction must be permitted if required by that natural expansion." This is a misconception. As the Pennsylvania Supreme Court stated in *Hanna v. Board of Adjustment,* 408 Pa. 306, 312-13, 183 A. 2d 539, 543 (1962) : "A basic purpose of zoning is to ensure an orderly physical development of the city, borough, township or other community by confining particular uses of property to certain defined areas. With such a purpose nonconforming uses are inconsistent. [citing cases]. . . . Even though zoning ordinances permit the continuance of nonconforming uses, it is the policy of the law to closely restrict such nonconforming uses and to strictly construe provisions in zoning ordinances which provide for the continuance of nonconforming uses. Nonconforming uses, inconsistent with a basic purpose of zoning, represent conditions which should be reduced to conformity as speedily as is compatible with the law and the Constitution."

In *Silver v. Zoning Board of Adjustment,* 435 Pa. 99, 102-103, 225 A. 2d 506, 507, 508 (1969), upon which appellant relies, the Supreme Court of Pennsylvania stated : "This right [of natural expansion] is not unlimited, however. The contemplated expansion must not be detrimental to the public health, welfare and safety. We have never questioned the right of a mu-

nicipality to impose reasonable restrictions on the expansion of a nonconforming use. . . . We are well aware that zoning authorities look upon nonconforming issues as the bane of their existence, and we can appreciate their efforts to keep nonconforming uses within bounds. Nevertheless, these authorities cannot arbitrarily abrogate a landowner's vested right of natural expansion by prohibiting all such growth. The municipality certainly can condition such expansion on certain prerequisites and standards necessary for the preservation of the health, safety and welfare of the community." The holding in *Silver* was that a municipality might not completely prohibit the natural expansion of an apartment house by precluding any additional unit whatsoever. The applicant in *Silver* merely desired to repartition to add additional units *without making any addition to the exterior of the building*. The ordinance in *Silver* violated the long-standing rule that a nonconforming use cannot be limited by a zoning ordinance to the prescise magnitude thereof which existed at the date of the ordinance.

Appellant, who asserts that the restriction at bar is unconstitutional as being violative of due process of law as applied to appellant's premises, has no easy task. As the Pennsylvania Supreme Court has repeatedly held : "One who challenges the constitutionality of a zoning ordinance has no light burden and it is settled that before a zoning ordinance can be declared unconstitutional it must at least be shown that its provisions are clearly arbitrary and unreasonable, having no substantial relation to the public health, safety, morals or general welfare. If the validity of the legislative judgment is fairly debatable, the legislative judgment must be allowed to control." *Glorioso Appeal,* 413 Pa. 194, 198, 196 A. 2d 668 (1964), citing *Village of Euclid v. Ambler Realty Co.,* 272 U.S. 365, 47 S. Ct. 114, 121

(1926); *Best v. Zoning Board of Adjustment,* 393 Pa. 106, 113, 141 A. 2d 606 (1958); *Gratton v. Conte,* 364 Pa. 578, 73 A. 2d 381 (1950).

Appellant's argument that the restriction in the case at bar is unreasonable because it is not based upon the size of the building in relation to the size of the lot overlooks numerous decisions applying similar limitations upon the expansion of nonconforming uses. In *Humphreys v. Stuart Realty Corp.,* 364 Pa. 616, 621, 73 A. 2d 407 (1950), the court declared of a nonconforming use: "permissible enlargement of the use does not warrant the erection of new buildings or structures or any additions to buildings beyond the twenty-five percent allowance hereinbefore referred to." The court stated that if the storage tanks in question were "structures," they were prohibited by the ordinance. In *Philadelphia Art Alliance v. Philadelphia Zoning Board of Adjustment,* 377 Pa. 144, 104 A. 2d 492 (1954), the court applied to expansion of a parking lot an amendatory ordinance limiting the extension of nonconforming buildings to twenty-five percent of the area of the building at the time the ordinance was adopted.

Appellant contends that the restriction in the case at bar is unreasonable because "by arbitrary reference to a cut-off date eight years prior to its enactment it limits appellant's constitutionally protected and vested rights to natural expansion of its nonconforming use." Appellant complains that the amendment is "retroactive" to the date the original ordinance became effective. In truth, however, reference to such date is entirely reasonable because the relevant date is the date upon which the use became nonconforming. Just as a nonconforming use cannot be limited to the precise magnitude thereof which existed at the date the use became nonconforming, so also is it appropriate to limit the natural expansion of a nonconforming use to a reasonable

percentage of its size at the time the use became nonconforming.[1]

Appellant deems itself aggrieved because the provisions in effect prior to the 1962 amendment were less restrictive. But a property owner has no vested right to the continued effect and application of a particular district classification or other regulatory provision of a zoning ordinance: *Pumo v. Norristown Borough,* 404 Pa. 475, 479, 172 A. 2d 828 (1961); *Key Realty Co. Zoning Case,* 408 Pa. 98, 99, 182 A. 2d 187 (1962). In *Walter v. Philadelphia Zoning Board of Adjustment,* 437 Pa. 277, 281, 263 A. 2d 123, 126 (1970), the Pennsylvania Supreme Court in holding that an extension of a nonconforming use, which would have been a matter of right under a prior ordinance, was validly rejected under a current ordinance declared: "Appellees' request for a variance is governed by the provisions of the zoning ordinance as it exists at the time of the application for a variance. It is that ordinance which is the controlling declaration of public policy as to the subject property; that a different policy may have prevailed some years in the past is of no account."

Order affirmed.

---

CONCURRING OPINION BY JUDGE CRUMLISH, JR.:

While I am in agreement with the result reached today by this Court, I am also in general agreement

---

[1] Although appellant points out that retroactive legislation was criticized in *Sawdey Liquor License Case,* 369 Pa. 19, 85 A. 2d 28 (1951) and *Yocum v. Power,* 398 Pa. 223, 157 A. 2d 368 (1960), the cases can be distinguished. In *Sawdey,* the property owner had acquired vested rights by expending substantial sums of money to commence construction of a permitted hotel in reliance upon the existing zoning ordinance which was subsequently amended to prohibit the dispensing of liquor. In *Yocum,* an amendment prohibiting churches in a district, after a religious organization had obtained a permit to erect a church, was invalid as to that church on the ground of special legislation.

with Judge Kramer's dissertation on the law in this Commonwealth regarding the expansion of nonconforming uses. I cannot agree with Judge Kramer, however, that the 50% extension limitation in the present case was unconstitutional as applied to Schiffer-Pfeiffer, Inc.

The right to expand nonconforming uses to meet natural business expansion is necessary to protect the original property interests in the tract. *Hanna v. Board of Adjustment,* 408 Pa. 306, 83 A. 2d 539 (1962). This does not mean, however, that municipalities must allow expansion or enlargement of a business to the fullest extent that the tract will hold. Here Schiller-Pfeiffer has expanded twice before, and could expand again to a lesser extent than requested and still be within the ordinance. It has not shown that to limit expansion to 50% would so jeopardize the entire operation of Schiller-Pfeiffer so as to threaten its property interests, i.e. the existence of its plant. Neither has it shown that the remaining portion of its tract is so small or irregular so as to prohibit its use in conformance with the zoning ordinance. Absent a showing that the limitation on expansion would jeopardize the existing nonconforming use, or would prohibit any reasonable use of the remaining land, I cannot hold the limitation unconstitutional as applied. I concur with the affirmance of the lower court.

---

DISSENTING OPINION BY JUDGE MANDERINO:

I respectfully dissent. A provision in a zoning ordinance which limits the expansion of a nonconforming use by percentage alone may be related to mathematics but has no rational relationship to the health, safety, and morals of the community. Because percentages, like statistics, seem to have an aura of certainty and exactness, it is easy to assume that there is some ra-

tional basis for a uniform percentage restriction on the expansion of a nonconforming use. This might be so if there were no variables in property owned by different citizens. Since many variables obviously exist, a percentage limitation can have widely varying and discriminatory effects upon individual property owners without any relationship to the health, safety or morals of the community. The fifty per cent limitation contained in the ordinance in question here may in some cases permit a property owner to expand and occupy one hundred per cent of his tract and in another situation limit a property owner even though the fifty per cent expansion would mean the occupation of only five percent of his tract. The size of the tract and its relationship to other adjoining properties is of necessity ignored. In some cases the percentage limitation may allow a natural expansion of the nonconforming use and in other cases it would stifle the natural expansion of a nonconforming use. A fifty per cent reference to variables has no relationship to the health, safety and morals of the community.

The majority opinion cites *Humphreys v. Stuart Realty Corp.*, 364 Pa. 616, 73 A. 2d 407 (1950), and also the case of *Philadelphia Art Alliance v. Philadelphia Zoning Board of Adjustment*, 377 Pa. 144, 104 A. 2d 492 (1954). The quotation from the *Humphreys* case was dictum and was not the basis of the court's decision. There was no discussion in *Humphreys* concerning the constitutionality of a percentage limitation. There was a brief simple statement by the opinion writer that was not necessary to the decision. The result in the *Humphreys* case was based on other grounds. In the *Philadelphia Art Alliance* case the court referred to the twenty-five per cent limitation present in that case, but did not decide whether or not the limitation was constitutional. The expansion desired in the *Philadelphia Art Alliance* case *was less* than the

twenty-five per cent permitted by the ordinance and the court specifically pointed out that the requested extension was less than that allowed by the ordinance. Neither of these cases decided that percentage limitations on nonconforming uses which stifled natural expansion met the necessary constitutional tests.

The percentage limitation in this case is not constitutional. Schiller-Pfeiffer, Inc. was entitled to a consideration of its request independent of the percentage limitation. I would remand for such a determination.

DISSENTING OPINION BY JUDGE KRAMER:

I respectfully dissent. Presently this Court has before it several appeals concerning requests for expansions to nonconforming uses. Research in these cases has brought about this dissent which may be equally applicable to the other cases.

In rendering this dissenting opinion I restrict it to those cases, such as here, where a property owner has established a lawful use on his land and *thereafter* (1) the municipality passes a zoning ordinance which makes such usage* nonconforming, or (2) where the municipality amends its zoning ordinance so that a usage either becomes nonconforming, or (3) an expansion of a nonconforming use or structure is further restricted. I draw this distinction at the outset for if a person purchases realty after the zoning ordinance makes the usage nonconforming, (1) the property owner has or should have knowledge of the restriction on the use

---

* In this opinion where I use the words "use" or "usage" it is intended to include land use, structures and buildings. Cases in Pennsylvania define "nonconforming uses" as "use of a building or land which does not agree with the regulations of the use district in which it is situated". *In Re Yocum*, 393 Pa. 148, 141 A. 2d 601 (1958). *Haller Baking Co. Appeal*, 295 Pa. 257, 145 A. 77 (1928).

of the property he has purchased, and (2) it may be assumed that the purchase price he paid reflects that restricted usage, and (3) therefore the owner is not harmed. If the zoning restrictions are applicable to all property and not limited to nonconforming uses, then this dissent would not be applicable.

This writer further recognizes that it may be argued that what is proposed herein would deter the advancement of the desired results of zoning ordinances, but in anticipation of that argument, I have restricted this opinion to those cases where there has been a change in the rules of the game after a property owner has committed himself to a then lawful conforming use of his property.

On this point I am impressed by the statement of the Court in *Yocum v. Power*, 398 Pa. 223, 227, 157 A. 2d 368 (1960): "As nothing can be more unjust in criminal law than an *ex post facto* law, so nothing is more frowned on in civil law than a procedure which has the effect of making illegal what the law has already recognized as legal. No lover of American sports would approve of changing ground rules to favor one side or the other after the game had begun."

## CONSTITUTIONAL PROPERTY RIGHTS

We should start with an understanding of the basic concepts of property rights under our constitutional law. This principle was succinctly stated in the *Lord Appeal*, 368 Pa. 121, 125, 81 A. 2d 533, 535 (1951). There the Court, after tracing the sanctity of private property rights back through the common law and the Magna Carta to the Roman law, stated: "Both our Federal and State Constitutions provide for and guarantee to every citizen certain unalienable rights and liberties; and with respect to property limit the paramount right of the Sovereign State to take an owner's

land for a public use only, and even then, only if it pays the owner just compensation: Fifth and Fourteenth Amendments to the Constitution of the United States; Article I, Section 10, Article XVI, Section 8, Constitution of Pennsylvania." Justice BELL in writing the majority opinion then sets forth what must be the best statement concerning these property rights as they apply to property owners in Pennsylvania, when he stated: ". . . an owner of property is still entitled in Pennsylvania to certain unalienable constitutional rights of liberty and property. These include a right to use his own home in any way he desires, provided he does not (1) violate any provision of the Federal or State Constitutions; or (2) create a nuisance; or (3) violate any covenant, restriction or easement; or (4) violate any laws or zoning or police regulations which are *constitutional*. It is now well settled that zoning acts and ordinances passed under them are valid and constitutional as structural or general legislation *whenever they are necessary for the preservation of public health, safety, morals or general welfare, and not unjustly discriminatory, or arbitrary, or unreasonable, or confiscatory in their application to a particular or specific piece of property. [Citing many cases]."* (Emphasis added)

Although one can find historically some form of governmental control of land usage even before Colonial times, for acts amounting to nuisances, governmental control in the form of zoning is a rather recent development. About 50 years ago, the modern concept of municipal planning and land utilization crept into municipal government in the form of zoning laws. The first zoning laws as we know them today appeared in the city of New York in about 1916, and the first zoning laws in Pennsylvania were established under enabling legislation in 1927. Zoning laws are in derogation of not only the common law but the basic con-

stitutional property laws, and should be strictly construed. *Lukens v. Ridley Township Zoning Board of Adjustment*, 367 Pa. 608, 80 A. 2d 765 (1951).

To understand why zoning became necessary is merely to understand how this country has developed in the last 50 years. Argument can be made that modern transportation (primarily the automobile) created the impetus for this new concept in property law. The great numbers of gasoline stations zoning cases in the early years, and later the parking lot and shopping center cases, graphically illustrate this point.

## ZONING UNDER THE POLICE POWERS

Zoning laws are founded upon the constitutional principle of the police powers of government to promote the public health, morals, safety and general welfare. *Best v. Zoning Board of Adjustment*, 393 Pa. 106, 141 A. 2d 606 (1958) and *Bilbar Construction Company v. Easttown Township Board of Adjustment*, 393 Pa. 62, 141 A. 2d 851 (1958). It is likewise clear, however, that the police power of government is not unlimited. In *Harris v. State Board of Optometrical Examiners*, 287 Pa. 531, 536, 135 A. 237, 239 (1926), the Court said: "The legislature under the police power does not possess the power to enact rules which have no substantial relation to the end to be obtained. . . . Legislatures do not have the power, under the guise of police regulation, to arbitrarily invade the personal right and liberty of the individual. Its [the Legislature] determination of the extent of its power is not final or conclusive."

A further caution was stated by Chief Justice STERN in the case of *Cott Beverage Corporation v. Horst*, 380 Pa. 113, 118, 110 A. 2d 405 (1955): "By a host of authorities, Federal and State alike, it has been held that a law which purports to be an exercise of the police power must not be unreasonable, unduly oppres-

sive, or patently beyond the necessities of the case, and the means which it employs must have a real and substantial relation to the object sought to be attained. Under the guise of protecting the public interests, the legislature may not arbitrarily interfere with private business or impose unusual and unnecessary restrictions upon lawful occupations. The question whether any particular statutory provision is so related to the public good and so reasonable in the means it prescribes as to justify the exercise of the police power, is one for the judgment, in the first instance, of the law-making branch of the government, *but its final determination is for the courts."* (Emphasis added)

Throughout the many reported cases there is much dicta on the niceties of such things as governmental discretion, public welfare, the need for land use planning, and for environmental esthetics. Although planning boards, boards of adjustment, and municipal legislatures consistently disclaim any notion that zoning is being used for solely esthetic, or solely ethnic, or solely economic reasons, practical experience with these cases leads this writer to the conclusion that many times the real purposes behind use restrictions are the desires of special interest groups. These groups attempt to utilize zoning ordinances to protect their own property or to increase the value of it by prohibiting some other property owner from using his property. They seem to be fearful of their neighbor's property use which may actually or psychologically interfere with the value or use of their own property.

There can be no question that zoning laws utilizing the concepts of comprehensive plans and public hearings have created better communities, but these laws have placed restrictions on a person's right to use his property, sometimes unreasonably, under the guise of the police powers. Planners use zoning laws to keep out undesirables, whether persons or occupations.

To those who hold to the position that a planning commission and the legislative body of a municipality should absolutely control the land usages, nonconforming uses are a cancer to be eliminated and retarded at all costs.* Fortunately, however, the interests of the nonconforming use owner come under the protective cover of constitutional due process; and it became clear early in the development of zoning laws that nonconforming uses had to be protected.

Nonconforming uses are those tolerated uses of property (land, structures, or both) which existed at the time of the effective date of the zoning ordinance (or amendments thereto), and which do not come within the uses permitted in the area designated in the ordinance. *In Re Yocum,* 393 Pa. 148, 141 A. 2d 601 (1958). If a person purchases a piece of property with knowledge that its use is already restricted by a zoning ordinance, there is no real need to be concerned about taking his property; and such a property owner properly should be left to his remedies under the zoning procedures, e.g., variance or special exception applications. However, where the owner has commenced to use his property in a conforming way, that only becomes nonconforming because a zoning ordinance is passed after, or amended after, he purchased the property, we have an entirely different situation.**

---

* For example, the Philadelphia Zoning Code says at §14-104 *Non-Conforming Structures and Uses*: "It is the purpose of this Section to discourage and eventually eliminate nonconforming uses and structures because they are detrimental to the orderly development of the City."

** I want to make it clear at this point, although the record does not disclose the problem in this case, that if the property owner has *clearly* shown his *intent* to use his property in a way which later becomes nonconforming, this would not be considered an expansion at all. *Haller Baking Co. Appeal,* 295 Pa. 257, 145 A. 77 (1928).

## THE DOCTRINE OF NONCONFORMING USE EXPANSION

The court early recognized this problem and developed the doctrine of natural expansion. In *Gilfillan's Permit*, 291 Pa. 358, 362, 140 A. 136, 137 (1927) the Court said: "Petitioner's business had been established at its present location long before the passing of the zoning ordinance and was actively conducted at the time the ordinance went into effect; accordingly, as the property was then used for lawful purposes, the city was without power to compel a change in the nature of the use, or prevent the owner from making such necessary additions to the existing structure as were needed to provide for its natural expansion and the accommodation of increased trade, so long as such additions would not be detrimental to the public welfare, safety and health."

Earlier in the above-cited case the Court stated, at 361: "But inasmuch as the natural effect of ordinances of this description is to limit private rights in the interest of the public welfare, the exercise of the power must be carefully guarded and permitted only in cases where the conditions and circumstances are such as to show the effect of the ordinance to be a reasonable and proper exercise of the police power. The subject is considered by this Court in Ward's Appeal, 289 Pa. 458 and Liggett's Appeal, 271 Pa. 109, and by the Supreme Court of the United States in Village of Euclid v. Ambler Realty Co., 272 U.S. 365, in which the constitutionality of such ordinance is upheld as a proper exercise of the police power, provided they do not interfere with the use or control of private property without relation to the public safety, health, morals and general welfare, and also holding that the power to regulate does not extend to an arbitrary, unreasonable or unnecessary intermeddling with the ownership of private property."

The passage of time saw our Supreme Court give recognition to the constitutional implications involved in the area of expansion of nonconforming uses*. The court in *Upper Darby Township Appeal*, 391 Pa. 347, 354, 138 A. 2d 99, 102 (1958) stated: "If we were to prevent the natural growth and expansion of a protected nonconforming use, *we would invade the constitutional guarantees of due process which indeed brought the nonconforming principle into being."* (Emphasis added) The Court recently re-emphasized this principle in the case of *Silver v. Philadelphia Zoning Board of Adjustment*, 435 Pa. 99, 102, 255 A. 2d 506, 507 (1969) wherein it said: "The rationale behind the doctrine [of expansion] can be traced to the due process requirements protecting private property. If a person owns property which constitutes a valid nonconforming use, it is inequitable to prevent him from expanding the property as the dictates of business or modernization require. . . . Although our opinions have apparently never explicitly so held, *we must conclude from the tenor of these decisions that the right of natural expansion is a constitutional right protected by the due process clause."* (Emphasis added.) In the *Silver* case, there was a prohibition against all natural expansion of nonconforming uses within certain districts. The Court held, "What a city cannot do is indiscriminately forbid all natural expansion." The opinion hastened to qualify the right of natural expansion by saying: "This right is not unlimited, however. The contemplated expansion must not be detrimental to the public health, welfare and safety. We have never ques-

---

* The Pennsylvania Supreme Court has also spoken concerning the constitutional principles upon which the protection of existing nonconforming uses is based. See: *Hanna v. Zoning Board of Adjustment*, 408 Pa. 306, 312, 183 A. 2d 539, 543 (1962); *Molnar v. George B. Henne & Co.*, 377 Pa. 571, 581, 105 A. 2d 325, 329, 330 (1954).

tioned the right of a municipality to impose reasonable restrictions on the expansion of a nonconforming use."

I believe that the teaching of the *Silver* case and its predecessors stands for the proposition that the right to natural expansion is one which inheres in the property subject only to reasonable regulation. To allow a municipality to create any blanket percentage of permitted expansion is to do violence to this judicially created doctrine. The concept of natural expansion, I believe, means just what the words imply, an expansion which is appropriate and necessary to the use in question. The setting of any arbitrary percentage of permitted expansion is in diametric opposition to the essence of the doctrine. The Court in *Silver* at 103, cited *Gross v. Zoning Board of Adjustment*, 424 Pa. 603, 227 A. 2d 824 (1967) "Pennsylvania's ruling in this respect [expansion of nonconforming uses] is premised upon the view that the owner of property to which a lawful nonconforming use has attached *enjoys a vested property right thereto* which may not be abrogated, unless it is a nuisance, or abandoned, or is extinguished by eminent domain [citing authorities] *and that a zoning ordinance cannot preclude a natural and reasonable expansion thereof.*" (Emphasis added.) To drastically curtail such a right places a heavy burden of proof upon a municipality. This above-mentioned burden would necessitate showing that given the extent of an expansion which would be natural, nevertheless the interests of public welfare, etc., require its restriction.

In an attempt to carry out the doctrine of natural expansion of a nonconforming use, municipalities throughout this State arbitrarily established percentages of the land, structure or building use which a nonconforming use property owner could expand on the property in question. The percentage restrictions range from about 10 percent to about 50 percent depending on the whim of the municipal legislative body. This

In cornerstoning its decision, the majority relies on *Smethport Area School District, supra,* and *Conestoga National Bank v. Patterson,* 442 Pa. 289, A. 2d (1971). In *Smethport,* Justice POMEROY said that Article V, Section 9, "was not, of course, self-executing, . . ." and noted that there were four statutes designed to implement it. In *Conestoga Bank,* Justice ROBERTS wrote that "this constitutional provision as implemented . . . mandates . . . an appeal as of right. . .". The majority tortures this language and construes that the Supreme Court would stress the necessity of implementing legislation to demand it as a prerequisite for a right to appeal. This, in my judgment, overlooks the break in the bridge of reasoning. The fact is that this issue has never been before the Supreme Court. In *Smethport* and *Conestoga Bank,* the issue before the Court involved only the question of the appropriate forum appointed by the Legislature. Can we, and I say we should not, grasp ambiguous[2] and general language of our Supreme Court to steer ourselves on a course which leads us to an impractical and unreasonable dock, particularly when the effect of such an interpretation would be to void the obvious purpose of the constitutional enactment?

But, it is not enough to merely decide that Article V, Section 9 provides appeals of right from administrative agencies. In expressing my opinion, I do not forget that we must determine whether this action involves such an appeal. The majority has mustered a formidable body of irrefutable case law in holding that the Council of Basic Education is not an administrative body from which appeals should lie. *South Mid-*

---

[2] The language in *Conestoga Bank* is ambiguous and contradictory in that Justice ROBERTS in a footnote earlier in that opinion stated: "The issue of appealability is now clearly and finally resolved. Art. V, Sec. 9 of the Constitution has created and mandated a *right of appeal* from agency action." (Emphasis original)

*dletown School District, supra; Esbenshade, supra.* However, the reasoning which found these decisions has been made inapplicable by Article V, Section 9.

Both *South Middletown* and *Esbenshade* rely on legislative determination of "agency adjudications." In both cases, the Supreme Court held that the Administrative Agency Law, Act of June 4, 1945, P. L. 1388, §1 *et seq.,* as amended, 71 P.S. §1710.1 *et seq.* limits appeals from administrative agencies to adjudications, and that the Legislature had determined that the decision to approve or disapprove annexation of a part of a school district was administrative not adjudicative. See *Esbenshade,* 181 Pa. Superior Ct. at 239-41. As stated by Judge BOWMAN, now our President Judge, when sitting on the Dauphin County Court of Common Pleas in the *South Middletown* case: "It was under . . . *statutory provisions* that the *Susquehanna Township School District* [62 Dauph. 125 (1951)] and the *Esbenshade* cases were decided and held that the action of the Council (Board) in this area was nonjudicial and from which action no appeal would lie to this Court." 86 Dauph. 361, 365 (1966). (Emphasis added.)

I do not dispute the conclusion of the majority that the action by the Council was nonadjudicatory. Since *Newport Township School District v. State Tax Equalization Board,* 366 Pa. 603, 79 A. 2d 641 (1950), the Supreme Court has held that actions such as this are nonjudicial without relying upon any legislative determination of that issue. However, *Article V, Section 9 did not give the Legislature the power to limit appeals from administrative agencies to quasi-judicial matters.* We shall not rely on the restrictions of appeal which are set forth in the Administrative Agency Law. It is for us to make that determination. *Esbenshade* and *South Middletown* no longer control this issue.

The distinction between adjudicatory or judicial decisions by agencies and their administrative decisions was clearly set forth in *Newport* which framed the portrait of all later decisions in this legal museum. Mr. Justice LADNER, in answering the question of whether purely administrative decisions are reviewable stated: "No statute since 1874 has enlarged our certiorari powers so far as *administrative* or nonjudicial tribunals are concerned. . .". (Emphasis original) 366 Pa. at 608. *Article V, Section 9 has finally enlarged the powers of the courts of Pennsylvania in this regard.* As stated by Justice POMEROY in *Smethport, supra*: This introduced a new concept to Pennsylvania jurisprudence, one which recognized the important position of administrative agencies in modern government, the quasi-judicial functions that many of them perform and the fact that *both property rights and personal rights can be seriously affected by their decisions.* (Emphasis added) 440 Pa. at 314. Our experience dictates and I firmly believe that administrative decisions by agencies have the same incisive effects on personal and property rights as adjudicatory decisions. I believe that Article V, Section 9 was not intended to limit its reference to appeals from *"administrative"* agencies to "adjudications".[3] I judge that Article V, Section 9 intended to provide a right of appeal from any and all *administrative* decisions.

Insomuch as this Court has been presented with an appeal of right from the decision of an administrative agency which has not been directed to another "court of record" or "appellate court", it should have determined the merits of that appeal. Section 403 of the Appellate Court Jurisdiction Act of 1970, July 31, 1970,

---

[3] Article V, Section 9 explicitly limits appeals from courts "not of record" to "cases" but places no restriction on appeals from administrative agencies. If any such limitation were intended, would it not have been manifested?

Act No. 223, gives this Court jurisdiction in "all appeals from administrative agencies of the Commonwealth under the Administrative Agency Law or otherwise. . .". While this may not explicitly provide for jurisdiction over this case in the Commonwealth Court,[4] it certainly provides us with greater familiarity with the problems and procedures inherent therein than the other appellate courts. *In the absence of a legislative determination otherwise,* I would accept jurisdiction in this case, and in doing so, protect appellant's constitutional right of review.

---

[4] While I am persuaded by Judge MANDERINO's dissenting opinion that Section 403 of the Appellate Court Jurisdiction Act has implemented Article V, Section 9, and provided for appeals such as this one in the Commonwealth Court, I have some doubt as to the validity of this argument. In *Smethport Area School District v. Bowers*, 440 Pa. 310, 269 A. 2d 712 (1970), Justice POMEROY, subsequent to the passage of the Appellate Court Jurisdiction Act, failed to list it as one of the four statutes by which the Legislature implemented Article V, Section 9. Therefore, it would seem that the phrase "or otherwise" in Section 403 merely refers to the three implementing statutes other than the Administrative Agency Law, instead of providing additional implementation of Article V, Section 9.