Philadelphia *v.* Angelone.

Argued February 10, 1970, before President Judge BOWMAN and Judges CRUMLISH, JR., KRAMER, WILKINSON, JR., MANDERINO, MENCER and ROGERS.

*Carl K. Zucker,* Deputy City Solicitor, with him *Matthew W. Bullock, Jr.,* First Deputy City Solicitor, and *Levy Anderson,* City Solicitor, for appellant.

*Charles J. Devlin, Jr.,* with him *Frank Carano* and *Carano & Kunken,* for appellee.

OPINION BY JUDGE ROGERS, August 13, 1971:

This appeal is from an order of the court below reversing the action of the Zoning Board of Adjustment of the City of Philadelphia in refusing a variance. The city brought this appeal.

In 1965 the appellees acquired a dwelling house at 1538 Vernon Road in the West Oak Lane section of

Philadelphia and applied for and received a permit to use the house as a funeral parlor. The house is at the end of a row of single family houses constituting the 1500 block of Vernon Road. The appellees' lot, as do those of their neighbors on Vernon Road, extends to Greenwood Street. Abutting the open side of appellees' lot is a public driveway from Vernon Road to Greenwood Street which provides access for the rear of another block of single family houses constituting the 7900 block of Pickering Street. Vernon Road, Greenwood Street, Pickering Street and other streets of the vicinage are lined with modern, single-family row homes typical of newer sections of the city developed since World War II. They form a residential enclave in an area of expanding commercial activity particularly along Cheltenham Avenue, a principal thoroughfare of the city. Across Vernon Road from appellees' funeral parlor and the other homes on Vernon Road is the stadium of Temple University, a substantial and not unattractive brick structure and an appurtenant large field, kept in grass. When the appellees purchased 1538 Vernon Road the area of this development of homes was within a district zoned for commercial purposes. As a result of the permit granted appellees and their conversion of the house to funeral parlor use, other residents memoralized City Council which in November 1965 placed the neighborhood within a residential zoning district designated R-9.[1] Thus, when this case commenced the appellees' undertaking business was a nonconforming use of their row house on Vernon Road.

Appellees' lot, 19 feet wide and about 120 feet in depth, contains about 2,200 square feet. Their building measures 19 feet in width and 36 feet in depth and is

---

[1] The lands owned by Temple University are within an R-5 district, more restrictive than R-9.

two stories in the front and, because the grade declines, consists of a basement and two stories at the rear. The open rear yard, 19 feet wide, extends from the rear of the building a distance of about sixty feet to Greenwood Street. The appellees propose to construct within the rear yard a two story addition to the house[2] measuring 19 feet by 35 feet, the lower floor of which would be used as a garage and the upper story, at a level with the first floor of the house, as an enlargement of the room used in their undertaking business as a viewing room. Obviously if this project is to be accomplished, the area of appellees' lot covered by building would be doubled. The addition would protrude into the rear yard about 33 feet beyond the rear building line of the other houses on Vernon Road.[3]

More than sixteen percent of the people of Pennsylvania, containing 45,330 square miles and the third most populous state in the country, reside within the 129 square miles comprising the City of Philadelphia. In addition to providing living space for its two million people, Philadelphia finds accommodation for the largest fresh water port in the world, the largest petroleum refining center on the east coast and numerous and extensive industrial, commercial, cultural, educational and recreational[4] enterprises. The peculiar tensions attendant upon living and working among throngs of people, apparent to those who must experience them, are receiving increasing attention of scientists of many disciplines. Events in our great cities are daily proving that pessimistic forecasts for their future, late-

---

[2] At the hearing before the Board, appellees withdrew an application for a variance to construct an addition to the front of their building.

[3] Appellees' house, at the end of the row, is shorter than its neighbors by about two feet.

[4] Including the eight square miles of Fairmount Park, the largest municipal landscaped park in the United States.

ly considered jeremiads, were in fact sober prophecies. At an earlier time, with prescience not usually associated with government, urban planning and its executive arm, zoning, were developed and have become "accredited adjunct[s] of municipal government." *Bilbar Construction Company v. Easttown Township Board of Adjustment,* 393 Pa. 62, 73, 141 A. 2d 851 (1958). Without regulations adequate to provide and maintain reasonable separation of the disparate activities carried on at close quarters in a great city, the discomfitures of urban living would in time outweigh its attractions, as happened in ancient Rome.[5]

The Zoning Code of Philadelphia, consistent with the problems with which it deals, is formidable. It divides the city into seven use districts and further subdivides the residential district into no less than 24 subclassifications. Bespeaking the intensity of land use, a minimum lot area of as much as 15,000 square feet is required in only four of these districts, which other regulations show to be designed for so-called high rise apartment use. In the three most restricted residential districts in which uses are essentially confined to single-family dwellings, one requires a 10,000 square foot lot and the other two 5,000 square feet. In 11 of such districts the lot area requirements range from 3,150 to 1,440 square feet and in two there are no area requirements whatsoever. In the R-9 district only single-family houses, detached or semi-detached, duplex dwellings and multiple dwellings[6] are permitted uses, and the minimum lot area requirement is only 1,440 square feet.

---

[5] Jerome Carcopino, Daily Life in Ancient Rome, Yale University Press, 1940, Chapter III.

[6] Multiple dwellings are defined as dwellings occupied by three or more families, including rooming and boarding houses, and similar dwellings, except hotels, apartment hotels and motels. Code, Section 14-102(e).

As stated, appellees desire to construct in the rear yard of this lot a 19 foot by 35 foot addition to their 19 foot by 36 foot house cum funeral parlor. Section 14-104(7) of the Zoning Code provides that no additions to a structure containing a nonconforming use shall be made which, when added to all structural additions made since the use first became nonconforming, would cause the aggregate gross floor area of all such additions to exceed ten percent of the gross floor area of the structure when the use first became nonconforming. Accepting appellees' statement in their brief that the existing building has a gross floor area of 2,052 square feet, the Code would permit construction of single floor addition measuring the 19 feet width of the lot to a depth ten and one-half feet. The appellees seek to add and devote to this nonconforming use 1,830 square feet of floor area.

Refused a permit by the Department of Licenses and Inspections, the appellees appealed to the Zoning Board of Adjustment, requesting a variance to exceed the ten percent limitation of Section 14-104(7). The only evidence adduced by the appellees at the hearing before the Board was their counsel's recital of the zoning history of 1538 Vernon Road, general statements of support by two persons from the neighborhood, a letter of similar import from a local clergyman, and a scant two pages of testimony of the appellee Mr. Angelone. On direct examination Mr. Angelone testified that his funerals would not be larger as a result of the proposed addition to their facility but that more people could sit during viewings. On cross-examination, he testified that he and his customers suffer inconvenience because he is required to conduct large funerals in more commodious facilities elsewhere. On direct examination Mr. Angelone stated that there is ample parking on the streets; on cross-examination he agreed that at least in the immediate vicinity of his

establishment street parking was limited by neighbors' use of available spaces, intersecting streets and parking restrictions. Two protestants testified, one the owner of the house adjoining the funeral parlor and the other a resident of Pickering Street, both of whom protested the proposed obstruction of their view, light and air by the 35 foot, two story building sought to be erected in this rear yard. Other residents of the neighborhood appeared and entered their names and addresses on the record as evidence of their opposition.

The Board found that there was no reason why a ten percent addition as permitted by the Code might not practically be constructed, that there were no other commercial uses on the block, that there were no off street parking facilities available,[7] and that the addition would adversely affect the light and air of neighbors on Pickering Street and Vernon Road. It concluded that appellees had shown no hardship peculiar to their property, that the only actual hardship shown was of an economic nature not justifying the relief sought, that the variance would adversely affect the public health, safety and general welfare and the particular interests of neighbors on Vernon Road and Pickering Street. It refused the variance.

No testimony was taken in the court below. It reversed on the ground that the Board had abused its discretion in not granting the variance. The court's opinion is brief and unclear as to what principles of law were conceived to be applicable.

---

[7] Appellees have printed in their brief a copy of a letter from Temple University, Office of Urban Affairs, approving appellees' request for use of a parking facility owned by it, subject to unspecified conditions. This was not before the Board. Its only interest is as contrast to Mr. Angelone's testimony that he did not need Temple's facilities because there is "plenty of parking" on the street.

The principles which are applicable, together with the facts as hereinbefore set forth, fully support the Board, whose decision, not the court's, we must review. *Village 2 at New Hope, Inc. Appeals,* 429 Pa. 626, 241 A. 2d 81 (1968).

Constitutional limitations require that nonconforming uses be permitted to continue. They are not, however, favorites of the law. As stated by Mr. Justice Benjamin R. JONES: "A basic purpose of zoning is to ensure an orderly physical development of the city . . . by confining particular uses of property to certain defined areas. With such a purpose nonconforming uses are inconsistent. Molnar v. George B. Henne & Company, Inc., 377 Pa. 571, 581, 105 A. 2d 325. The continuance of nonconforming uses under zoning ordinance is countenanced because it avoids the imposition of a hardship upon the property owner and because the refusal of the continuance of a nonconforming use would be of doubtful constitutionality. Even though zoning ordinances permit the continuance of nonconforming uses, *it is the policy of the law to closely restrict such nonconforming uses and to strictly construe provisions in zoning ordinances which provide for the continuance of nonconforming uses. Nonconforming uses, inconsistent with a basic purpose of zoning, represent conditions which should be reduced to conformity as speedily as is compatible with the law and the Constitution."* Hanna v. Board of Adjustment, 408 Pa. 306, 312-313, 183 A. 2d 539, 543 (1962). (Emphasis supplied.) Not only is the continuance of a nonconforming use protected, but it may be enlarged to provide for natural expansion and the accommodation of increased trade. *Gilfillan's Permit,* 291 Pa. 358, 140 A. 136 (1927). The right of expansion is, however, subject to limitations either of the law itself or of the applicable zoning regulations. "This right [of expansion] is not unlimited, however. The contemplated expansion must

not be detrimental to the public health, welfare and safety. We have never questioned the right of a municipality to impose reasonable restrictions on the expansion of a nonconforming use." *Silver v. Zoning Board of Adjustment,* 435 Pa. 99, 102, 255 A. 2d 506, 507 (1969).

With respect to the question before us in this matter, certain principles have been developed which are clear, reasonable and consistent with constitutional principles. Structures may be erected on open land previously devoted to a nonconforming use, as of right. However, the erection of structures upon land not previously so used, may only be accomplished by way of variance, the requisites of which are hardship to the owner and absence of detriment to the public interest. *Peirce Appeal,* 384 Pa. 100, 119 A. 2d 506 (1956); *Mack Appeal,* 384 Pa. 586, 122 A. 2d 48 (1956). The fact that an expansion of a nonconforming use is proposed is itself an important factor in the consideration of whether a variance should be granted for that purpose. *Mack Appeal, supra.*

There is no evidence whatsoever in this record of any use by the appellees of their rear yard. An examination of photographs in the record show it to be identical to those of neighboring properties, a grass plot with cement strips upon which a vehicle may be stationed. The two doors at the rear of the building are for persons, not vehicles, so that we are unable to infer that vehicles useful in appellees' business might be kept there. The appellees were, therefore, required to establish their entitlement to a variance. In *O'Neill et al. v. Zoning Board of Adjustment,* 434 Pa. 331, 254 A. 2d 12 (1969), the property owner sought a variance to build an apartment building larger than that permitted by the Philadelphia Code. Mr. Justice Benjamin R. JONES said: "In considering the merits of this appeal, we bear in mind the following principles which

govern the disposition of variance cases . . . variances should be granted only sparingly and only under exceptional circumstances . . . [and] in order to obtain a variance, the petitioners must prove (1) that the variance will not be contrary to the public interest and (2) that unnecessary hardship will result if the variance is not granted . . . [and] . . . a variance will not be granted solely because the petitioner will suffer an economic hardship if he does not receive one." 434 Pa. 331, 254 A. 2d 14. These principles apply with respect to variances sought for the expansion of nonconforming residential structures. *Walter v. Philadelphia Zoning Board of Adjustment,* 437 Pa. 277, 263 A. 2d 123 (1970); *Clifton Heights Appeal,* 440 Pa. 101, 270 A. 2d 400 (1970).

According the fullest possible weight to the fact that the appellees established their business prior to the change of use district, we believe that the Board's decision is fully supported on this record. It was generous to appellees in suggesting that economic hardship had been proved. Neither loss of business opportunity nor increase of costs was shown. The scant and casual record here made does not support the finding of a condition more onerous than that aptly described by Mr. Angelone as an inconvenience. Furthermore, the Board's finding that a grant of the application would adversely affect the public interest is demonstrated on the record. The protrusion of this addition, diminishing the light, obstructing the circulation of air and destroying the prospect at the rear of these row houses would be highly injurious to persons living in this modest but pleasant community, and the Board correctly so held.

The appellees attack the constitutionality of the ten percent limitation on expansion, permitted by the Code. But it is not this limitation which obstructs appellees' way to relief, but their inability to carry the

burden of proving the requisites of a variance. Indeed, the effect of the provision is to broaden appellees' rights, not to narrow them. By it they may add to this nonconforming use to the extent it permits without proof of hardship or absence of injury to the public interest. Rather than diminishing rights, it confers them; for its effect is to require that only the excess of its allowance must be supported upon variance principles. In any event, such limitations have been upheld. *Humphreys et al v. Stuart Realty Corporation,* 364 Pa. 616, 73 A. 2d 407 (1950); *Philadelphia Art Alliance v. Philadelphia Zoning Board of Adjustment,* 377 Pa. 144, 104 A. 2d 492 (1954); *Schiller-Pfeiffer, Inc. v. The Upper Southampton Township Board of Adjustment,* 1 Pa. Commonwealth Ct. 588, 276 A. 2d 334 (1971). Their effect is precisely that decided upon in *Peirce Appeal* and *Mack Appeal, supra,* with respect to ground devoted to business use and that not so used. The owner may as of right enlarge his building to the extent permitted by the zoning regulation; if he is to do more he must show entitlement to a variance.

Even were a substantial constitutional issue involved with regard to the ten percent allowance of expansion as of right, we could not in these circumstances find this limitation lacking in reasonableness. The Philadelphia Code in its attempt to meet the need for homes in a great city has provided for intensive residential development on extremely small lots. Doctrinaire considerations of vested rights, burden of proof and personal equities pale before the facts of life in the metropolis, rich in public advantage but often poor indeed in private amenities. We should not, therefore, be astute to strike down a provision restrictive of the intrusion of commercial uses into the limited open area available in this residential district; rather we should "exercise self-restraint as to substituting our opinions far removed from the particular zoning hear-

ing for the well considered decision of the local officials." *Cohen v. Zoning Board of Adjustment of Philadelphia,* 3 Pa. Commonwealth Ct. 50, 276 A. 2d 352, 355 (1971).

Order reversed.

--------

DISSENTING OPINION BY JUDGE KRAMER:

Once again this Court is confronted with issues concerning the expansion of a nonconforming use of zoned property, and once again I must respectfully dissent. Contrary to the statements found in the majority opinion that the Pennsylvania Supreme Court has approved the use of an arbitrary percentage (here 10%) in municipal zoning ordinances for permissible expansion of nonconforming uses, this writer has not found any such pronouncement. The majority relies upon two cases (*Humphreys et al. v. Stuart Realty Corp.,* 364 Pa. 616, 73 A. 2d 407 (1950), and *Philadelphia Art Alliance v. Philadelphia Zoning Board of Adjustment,* 377 Pa. 144, 104 A. 2d 492 (1954) as support for the use of such arbitrarily set expansion percentages; but a careful reading of those cases indicates that the Pennsylvania Supreme Court has not ruled specifically upon this issue to date. The *Humphreys* case was a nuisance case which turned on whether storage tanks were structures. The *Philadelphia Art Alliance* case was a case where the expansion was within the set percentage (there 25%) and onto an adjoining lot not covered by the then existing nonconforming use. Even under the reasoning of this dissent, a variance for adjoining property is proper.

In *Schiller-Pfeiffer, Inc. v. The Upper Southampton Township Board of Adjustment,* 1 Pa. Commonwealth Ct. 588, 276 A. 2d 334 (1971), this writer set forth, in a dissenting opinion, the reasons why a fixed expansion percentage without proof of its applicability is confiscatory, in those cases where the municipality, by a

*subsequent* zoning ordinance or an amendment thereto, restricts a nonconforming use (of what had been a conforming use) by such an arbitrary and unsupported use of police powers. Everything I said there is equally applicable here.

None of the cases cited by the majority, or the Board in its brief, is applicable to the facts of this case. All of such citations are cases (1) where the property owner *requested* a variance, or (2) the zoning ordinance, or its amendment, creating the nonconformity was passed *before* the property owner acquired such use, or (3) the expansion was onto adjoining property.

By comparison, here we have a property owner who was permitted, under a use certificate, to invest in and develop his property for a lawful use which was *thereafter* transformed into a nonconforming use, and who now seeks a building permit but is restricted from a natural expansion by an arbitrary percentage written into the zoning ordinance amendment.

There is not one word of testimony or one piece of evidence in the record of this case which supports the 10% restriction to appellees' requested expansion. Without such support the restriction should be unenforceable.

This is an appeal from an order of the Court of Common Pleas of Philadelphia County sustaining an appeal of Leandro Angelone and his wife (appellees here) from an adjudication of the Zoning Board of Adjustment (Board) of the City of Philadelphia (City), which had refused a variance* to the appellees.

---

* Before getting into the facts of the case, it should be noted that the record indicates that the appellees made application for a zoning permit to erect an extension to their existing funeral home building. The appellees did *not* request a variance. However, during the course of the hearing, the Board transformed these proceedings into a request for a variance. The lower court and the majority gloss over this questionable procedure. How the

The lower court directed the Board of Adjustment to grant the variance requested. The court below did not take any additional testimony but decided the case on the record made before the Board.

In 1965, the appellees were granted a use permit to establish a funeral home (a permitted use) in what was then zoned a C-2 Commercial zone. Later, on November 22, 1965, the City of Philadelphia rezoned this area where the funeral home exists to a R-9 Residential. Because funeral homes are not a permitted use in an R-9 zoned area, the funeral home thereby became a nonconforming use. In 1968, the appellees filed an application to expand the funeral home by the erection of a structure measuring 18 feet by 35 feet,* as an addition to the existing building. This addition would be a one-story addition to the two-story structure, together with a basement. The entire lot is approximately 19 feet in width by 120 feet in length. It should be noted here that the application also requested approval for construction onto the front of the building, but this was withdrawn at the hearing. The amended application concerns only a construction onto the rear of the existing two-story funeral home. If the addition, as requested, is permitted, there will still be open land to the rear of the property measuring 19 feet by 37 feet. The majority infers that the rear of the property was not used for funeral business purposes. However, an examination of the photographic evidence indicates to this writer that it is used for funeral business purposes.

The Zoning Code of the City of Philadelphia at Section 14-104 provides as follows:

"Section 14-104 Non-Conforming Structures and Uses

---

Board and the court below are permitted to make this transformation without authority from the Legislature shall remain a mystery.

* According to the majority, the zoning ordinance would permit an extension 10'6" x 19'.

"It is the *purpose* of this section *to discourage and eventually eliminate* nonconforming uses and structures because they are detrimental to the orderly development of the City. (Emphasis added.)

"(7) *Extension of Structures Containing Nonconformity Uses.* No structural extensions or additions to a structure containing a nonconforming use shall be made after July 15, 1957, which, when added to all structural extensions and additions made since the use first began to be nonconforming, shall cause the aggregate gross floor area of all such structural extensions and additions to exceed *10%* of the gross floor area of the structure when the use first began to be nonconforming, subject to the following provisions:

"(a) Any such structural extensions or additions shall be in conformity with the area and height regulations of this Title for the district where the structure is located, and shall be contained within the boundaries of the lot occupied by the structure at the time the use first began to be nonconforming; . . ." (Emphasis added.)

It is also interesting to note that the city ordinance of November 22, 1965, which transformed the funeral home property of the appellees from C-2 Commercial to R-9 Residential, is restricted to a triangular-shaped tract of property 70 feet by 60 feet by 60 feet. The record shows that the purpose of this amendatory ordinance was to prohibit these particular appellees from further utilizing their property as would have been permitted under the commercial classification, and was directed specifically to them and not as a general overall city planning measure. In other words, it is clear to this writer that the City has used its zoning powers for the sole purpose of singling out these appellees for a freeze treatment of what was a lawful permitted use. After the appellees were enticed into a lawful business venture, the City changed the rules of the game. The

platitudes of the majority do not alter the fact that these appellees have had substantial property rights taken from them.

The record indicates that the appellees are unable to use the existing structure, which is approximately 19 feet wide by 36 feet long, for the natural growth purposes (now nonconforming) of operating their funeral home. The established reason for the expansion is to permit the appellees to provide more seating and standing room for visitors attending funeral services in connection with the viewing of deceased persons. Although some question was raised concerning the parking facilities, this was adequately answered by the submission of a letter from Temple University authorizing appellees to use Temple parking facilities nearby.

Inasmuch as the court below did not take additional testimony, the scope of review by this Court involves a question of whether the Zoning Board of Adjustment abused its discretion or committed an error of law. *Village 2 at New Hope, Inc., Appeals,* 429 Pa. 626, 241 A. 2d 81 (1968); *DiSanto v. Zoning Board of Adjustment,* 410 Pa. 331, 189 A. 2d 135 (1963).

The Board argues that in light of the Zoning Code, as quoted above, which limits the expansion of a nonconforming use to ten percent of the gross floor area of the structure when the use first became nonconforming, the appellees were duty-bound to meet the burden of proof to establish a right to a variance. This means that the appellees would be required to prove unnecessary hardship upon and which is unique or peculiar to their property, and secondly, that the proposed variance is not contrary to the public safety, health, morals or general welfare. However, we note that in all of the cases cited by the Board, such as *Clifton Heights Appeal,* 440 Pa. 101, 270 A. 2d 400 (1970) and *Walter v. Philadelphia Zoning Board of Adjustment,* 437 Pa. 277, 263 A. 2d 123 (1970), the property owner who

was seeking the expansion of a nonconforming use had purchased the realty *after* the zoning ordinance had been enacted or amended. In this case, as the related facts indicate, the appellees purchased and established their funeral home use prior to the time the City changed the rules of the game and made it nonconforming, and this fact makes the difference.

I agree with the majority that it is well recognized that a municipality may restrict the use of property through a zoning ordinance within its police powers to protect the public health, safety, morals and general welfare. This principle is so well-established, it needs no citation. However, there is another well-established constitutional principle that the exercise of this police power must not be unreasonable, unduly oppressive, or patently beyond the necessities of the case. When the government attempts to regulate property rights by means of a zoning ordinance, it must have a real and substantial relation to the object sought to be obtained. *Cott Beverage Corporation v. Horst,* 380 Pa. 113, 110 A. 2d 405 (1955).

We have long recognized that "Retroactive legislation is so offensive to the Anglo-Saxon sense of justice that it is never favored." *Appeal of Sawdey,* 369 Pa. 19, 22, 85 A. 2d 28, 30 (1951). In this case, the City of Philadelphia clearly intended to discourage and eventually eliminate this nonconforming use by its retroactive application of its zoning amendment. This is an attempt to take appellee's property for a public purpose without paying for it.

Another constitutional principle involved in this matter is that of the citizen's rights pertaining to his private property, and the Court in the case of the *Lord Appeal,* 368 Pa. 121, 125, 81 A. 2d 533, 535 (1951) said: "Both our Federal and State Constitutions provide for and guarantee to every citizen certain unalienable rights and liberties; and with respect to property,

limit the paramount right of the Sovereign State to an owner's land for a public use only, and even then, only if it pays the owner just compensation: Fifth and Fourteenth Amendments of the Constitution of the United States; Article I, Section 10; Article XVI, Section 8, Constitution of Pennsylvania. . . ." And further, Justice BELL in the majority opinion said: ". . . an owner of property is still entitled in Pennsylvania to certain unalienable constitutional rights of liberty and property. These include a right to use his own home in any way he desires, provided he does not (1) violate any provision of the Federal or State Constitution; or (2) create a nuisance; or (3) violate any covenant, restriction or easement; or (4) violate any laws or zoning or police regulations which are *constitutional*. It is now well settled that zoning acts and ordinances passed under them are valid and constitutional as structural or general legislation, *whenever they are necessary for the preservation of public health, safety, morals or general welfare, and not unjustly discriminatory, or arbitrary, or unreasonable, or confiscatory in their application to a particular or specific piece of property* [citing many cases]." (Emphasis added.)

In this case, the City of Philadelphia in patently intending to "eliminate" this nonconforming use, passed a piece of special legislation thereby bringing the use of the property under the ten percent expansion of nonconforming use section of the Zoning Code. There is not one word of testimony in the record of this case before the Board on how an expansion in excess of the ten percent in any way is detrimental to the public health, safety, morals and general welfare of the City of Philadelphia or the community where this property exists. To prohibit the appellees from using their property reasonably, by the application of a set percentage which was arbitrarily set and made applicable to all of the property in the entire area of the City of Phila-

delphia, can have no application to the facts in this case unless the City so proves it to be applicable. The absence of proof as to the applicability of the set percentage makes the restriction unreasonable and confiscatory.

The City, in an attempt to sidestep the clear ruling of the Pennsylvania Supreme Court in the case of *Gilfillan's Permit,* 291 Pa. 358, 140 A. 136 (1927) and *Silver v. Zoning Board of Adjustment,* 435 Pa. 99, 255 A. 2d 506 (1969), has established this ten percent maximum expansion of a nonconforming use. In *Gilfillan,* the Court said: "Petitioner's business had been established at its present location long before the passing of the zoning ordinance and was actively conducted at the time the ordinance went into effect; accordingly, as the property was then used for lawful purposes, the city was without power to compel a change in the nature of the use, or prevent the owner from making such necessary additions to the existing structure as were needed to provide for its natural expansion and the accommodation of its increased trade, so long as such additions would not be detrimental to the public welfare, safety and health." In *Silver,* the Court said: "What the city cannot do is indiscriminately forbid all natural expansion . . . this right is not unlimited, however. The contemplated expansion must not be detrimental to the public health, welfare and safety. We have never questioned the right of a municipality to impose reasonable restrictions on the expansion of a nonconforming use." What the City has attempted here is to meet the conditions which the Supreme Court discussed by providing what the *City* believes would be a proper expansion of the natural growth of all nonconforming uses. This it cannot do with impunity. It is assumed that the only reason the City of Philadelphia did not set the percentage at one percent is that that would be so obviously unreasonable and

confiscatory that it could not stand the test of scrutiny. I say that a blanket ten percent maximum is likewise unreasonable and confiscatory.

It is also interesting to note that the Board has taken it upon itself to require an applicant who requests an expansion of a nonconforming use beyond the ten percent to bear the heavy burdens which must be met to support a variance. In my opinion, a variance and an expansion of a nonconforming use are two different things. Variance is used when a property owner desires to expand (or do any other thing which might be contrary to the regulations for the zone in which his property exists) under circumstances where the property owner has no other rights. I agree with the majority when it cites cases (*Peirce Appeal*, 384 Pa. 100, 119 A. 2d 506 (1956); *Mack Appeal*, 384 Pa. 586, 122 A. 2d 48 (1956); *O'Neill et al v. Zoning Board of Adjustment*, 434 Pa. 331, 254 A. 2d 12 (1969); *Walter v. Philadelphia Zoning Board of Adjustment*, 437 Pa. 277, 263 A. 2d 123 (1970); and *Clifton Heights Appeal*, 440 Pa. 101, 270 A. 2d 400 (1970)) that where there is a petition for a variance or where the expansion is onto property not within the nonconforming parcel, the property owner must bear the burden of a variance; but those are not the facts here. A nonconforming owner has additional rights under which he may expand on his property to the natural growth of his use without the need to prove those elements necessary to substantiate a variance. Some courts have consistently countenanced the need to prove a variance in all expansion of nonconforming use cases. I take issue with such an approach. I believe an implication is to be made from *Silver, supra*, that, if a municipality attempts to restrict expansion of a nonconforming use entirely, the property owner need not prove a variance but rather only that he has requested to expand within the limits of "natural growth". The law does not per-

mit the municipality to restrict that natural growth entirely or to ten percent for all nonconforming uses over such a large area as the City of Philadelphia. It is an unreasonable restriction whether it is "entirely" or a percentage not shown to be reasonably applicable. If the property owner has proven that the expansion of his nonconforming use is reasonably within the natural growth of that use, and the municipality cannot prove that the restrictively set percentage is justified under its police powers, then the application for a use permit should be granted. As I said in *Schiller-Pfeiffer, supra,* this does not mean that set percentages may not be used at all. Rather, it means that if the municipality desires to restrict "natural expansion" permitted under the *Silver, supra,* doctrine, the municipality should be required to prove that its set percentage restriction is reasonably appropriate to the property and use in question.

In this case, the record amply justifies a conclusion that the expansion requested through the application for a use permit was within the reasonable natural growth of the use and should have been granted by the Board. To the extent that the order of the court below transformed the application to a request for a variance, the Order should be reversed. With regard to the Order reversing the Board and granting the permit to extend the funeral home structure to the rear, the Order should be affirmed.

---

DISSENTING OPINION BY JUDGE CRUMLISH, JR.:

I am in agreement with and join in the opinion of Judge KRAMER. However, I would further hold that, even if the ten percent restriction on expansion were to be upheld generally, this limitation is unconstitutional as applied to appellees.

In *Schiller-Pfeiffer, Inc. v. Upper Southampton Township Bd. of Adj.,* 1 Pa. Commonwealth Ct. 588,

276 A. 2d 334 (1971), while agreeing to the denial of expansion, I set forth in my concurring opinion what I believe to be the issues controlling expansion of non-conforming uses beyond limitations permitted by zoning ordinances: "The right to expand nonconforming uses to meet natural business expansion is necessary to protect the original property interests in the tract. Hanna v. Board of Adjustment, 408 Pa. 306, 183 A. 2d 539 (1962). This does not mean, however, that municipalities must allow expansion or enlargement of a business to the fullest extent that the tract will hold . . . [Schiller-Pfeiffer] has not shown that to limit expansion to 50% would so jeopardize the entire operation of Schiller-Pfeiffer so as to threaten its property interests, i.e., the existence of its plant. Neither has it shown that the remaining portion of its tract is so small or irregular so as to prohibit its use in conformance with the zoning ordinance. Absent a showing that the limitation on expansion would jeopardize the existing nonconforming use, or would prohibit any reasonable use of the remaining land, I cannot hold the limitation unconstitutional as applied." 1 Pa. Commonwealth Ct. at page 596.

In the case before us, the appellant has demonstrated the existence of both of the above requirements. The area over which he desires to expand cannot feasibly be used for a residential dwelling after the permitted ten percent increase is constructed. The appellant is merely requesting an extension to the rear of his building which would still conform to all set back and yard requirements. In addition, there is testimony to the effect that appellant's existing use has outgrown his structure and can no longer operate effectively within its present confines, even with the permitted increase. To refuse the expansion requested by *this* appellant would result in both the confiscation of his nonconforming use and the forced nonuse of his remaining

property without due process of law. Therefore, in this case the denial of the request because of the ten percent restriction in the zoning ordinance is an unconstitutional application of that limitation. I would affirm the order of the court below.

————

DISSENTING OPINION BY JUDGE MANDERINO:

There is a difference between the expansion of a *structure* and the expansion of a *use*. The Angelones wish to expand their existing structure. There is nothing in the record to indicate that the existing structure is a nonconforming structure so far as the requirements of the zoning district are concerned. The addition which the Angelones wish to make to their existing structure in order to expand the nonconforming use cannot be prevented unless the addition would be detrimental to the public welfare, safety and health. In *Silver v. Zoning Board of Adjustment,* 435 Pa. 99, 255 A. 2d 506 (1969), the Court reaffirmed the principle permitting the natural expansion of a nonconforming use as enunciated in *Gilfillan's Permit,* 291 Pa. 358, 140 A. 136 (1927). In that case it was specifically stated that an owner could not be prevented from making additions to existing structures unless the addition would in some way be detrimental to the public welfare, safety and health.

The record in this case contains no findings or conclusions that the expanded structure would violate any of the requirements of the present zoning law for the district. Without such a finding it cannot be said that the new structure (the old portion and the new addition) would be a nonconforming structure. Thus, the Angelones would certainly be permitted, so far as this record indicates, to build the addition which they want to build, except for only one fact—the *use* in the new structure.

The only reason given why the Angelones would not be permitted to expand the *use* in the new structure when it is completed is that the Philadelphia Zoning Ordinance states that a nonconforming use cannot be expanded beyond ten percent of the original existing nonconforming use. A nonconforming use is not the same as a nonconforming structure. Generally, however, there is no way to measure the expansion or contraction of a nonconforming use without relating it some way to a physical structure. Uses, whether conforming or nonconforming, do not float in midair. Thus, the Philadelphia Zoning Ordinance has attempted to control the expansion of a nonconforming use by stating that the permitted ten percent expansion is to be measured by the floor area devoted to the nonconforming use.

As I stated in my dissenting opinions in *Schiller-Pfeiffer, Inc. v. Upper Southampton Township Board of Adjustment,* 1 Pa. Commonwealth Ct. 588, 276 A. 2d 334 (1971) and *Torak et al. v. Board of Adjustment of Upper Merion Township,* 2 Pa. Commonwealth Ct. 48, 277 A. 2d 521 (1971), a blanket ten percent expansion on nonconforming uses is arbitrary and bears no relationship to the health, safety or welfare of the surrounding area.

If the new structure would not be in violation of any of the requirements of an R-9 area, the Angelones cannot be prevented from expanding the structure. They also cannot be prevented from expanding the *use* by devoting more floor area to the nonconforming use simply because of an arbitrary ten percent limitation existing in the ordinance on expansions of nonconforming uses.

Any other interpretation would mean that the structure which the Angelones currently own could be expanded by an addition so long as the use was conforming. This would mean that whatever interference

there might be with the air, light or vision of neighbors would be *permitted* if there were one use within the structure but would not be permitted if there were another use within the structure. This makes no sense at all—at least not to adjoining neighbors.

If the Angelones were asking to expand an existing structure which would in some way violate the requirements of an R-9 district as to height or width of structures, then it might be proper to consider whether or not they would qualify for a variance. No variance is needed if the expanded structure would conform in all respects to the requirements of the R-9 area. They would then be entitled to a natural expansion of their nonconforming use within the new structure which would be a *conforming* structure. I would remand this case for a determination as to whether or not the new structure (the old structure and the proposed new addition) would in any way be in violation of the requirements for structures in an R-9 area.